IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 08-0431-TUC-CKJ(HCE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Julio Alfonso Valenzuela-Espinoza, | |
| Defendant. | |

**I. PROCEDURAL HISTORY**

Defendant Julio Alfonso Valenzuela-Espinoza (hereinafter "Defendant") filed a Motion To Suppress Statements For Due Process And *Miranda* Violations; Memorandum (Doc. No. 21). The Government filed a Response to Defendant's Motion to Suppress Statements (Due Process, *Miranda*) (Doc. No. 23). The Government filed a Supplemental Memorandum In Response To Defendant's Motion To Suppress (Doc. No. 52). The Government filed a Response To Defendant's Supplemental Memorandum (Doc. No. 55). Defendant filed a Reply To Government's Response To Supplemental Memorandum (Docket 55) (Doc. No. 59). Defendant's Motion and the Government's Response came on for hearing on January 23, 2009 and February 13, 2009. The matter was taken under advisement.

Defendant filed a Motion To Suppress All Evidence And Statements As Tainted By An Illegal Search And Seizure; Memorandum (Doc. No. 22). The Government filed a Response To Defendant's Motion To Suppress Evidence And Statements (Search and Seizure) (Doc. No. 26). Defendant filed a Supplemental Memorandum In Support of Motion

1   To Suppress All Evidence and Statements As Tainted By An Illegal Search and Seizure

2   (Doc. No. 51). The Government filed a Supplemental Memorandum In Response To

3   Defendant's Motions To Suppress (Doc. No. 52). Defendant filed a Response To

4   Government's Supplemental Memorandum In Response To Defendant's Motions To

5   Suppress (Doc. No. 53). Defendant's Motion and the Government's Response came on for

6   hearing on January 23, 2009 and February 13, 2009.The matter was taken under advisement.

7        Defendant filed a Motion To Quash Warrant and Suppress All Evidence Obtained

8   Thereby As Tainted By An Illegal Search And Seizure; Request For *Franks* Hearing

9   Memorandum (Doc. No. 50). The Government filed a Response To Defendant's Motion To

10   Quash Warrant (Doc. No. 54). Defendant's Motion and the Government's Response came

11   on for hearing on April 21, 2009. The matter was taken under advisement.

12        Defendant filed Defendant's Supplemental Memorandum In Support Of Motion To

13   Suppress For *McNabb-Mallory* Violation (Doc. No. 56). The Government filed a Response

14   To Defendant's Supplemental Memorandum In Support Of Motion To Suppress For

15   *McNabb-Mallory* Violation (Doc. No. 64). Defendant filed a Reply To Government's

16   Response To Defendant's Supplemental Memorandum (Docket 56, 64) (Doc. No. 70).

17   Defendant's Motion and the Government's Response came on for hearing on May 8, 2009.

18   The matter was taken under advisement.

19        Defendant filed a Motion To Dismiss Indictment For Due Process And Sixth

20   Amendment Violation; Memorandum (Doc. No. 71). The Government filed a Response To

21   Defendant's Motion To Dismiss Indictment (Due Process, Sixth Amendment) (Doc. No. 76).

22   Defendant's Motion and the Government's Response came on for hearing on May 15, 2009.

23   Counsel for Defendant and the Government submitted the matter on the pleadings without

24   legal argument. The matter was taken under advisement.

25   **II. CHARGES**

26        Defendant Julio Alfonso Valenzuela-Espinoza is charged in a three count indictment

27   with knowingly and intentionally conspiring from a time unknown to on or about March 5,

28

2008 at or near Tucson, Arizona, in the District of Arizona, to possess with the intent to distribute 99.75 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 846 (Count 1); knowingly and intentionally possessing on or about March 5, 2008 at or near Tucson, Arizona, in the District of Arizona 99.75 kilograms of marijuana in violation of 21 U.S.C. §§841(a)(1) and (b)(1)(C) (Count 2); and on or about March 5, 2008 at or near Tucson, Arizona, in the District of Arizona, Defendant as an alien illegally and unlawfully in the United States, knowingly possessing firearms, i.e., a Beretta  92FS 9 mm handgun, serial number BER399643Z, and a FMJ Cobray .45/22 caliber handgun, serial number E00008531, said firearms being in and affecting commerce in that they were previously transported in the State of Arizona from another state or foreign country, in violation of 18 U.S.C. §§922(g)(5)(A) and 924(a)(2)(Count 3).

**III. STATEMENT OF FACTS**

Immigration and Customs Enforcement (hereinafter "ICE") Agent Van Holsbeke[1] states as Affiant in his Application and Affidavit In Support of Search Warrant (hereinafter "Affidavit") that he is empowered to conduct investigations and make arrests for smuggling offenses enumerated in 19 U.S.C. §545 and possession, distribution and unlawful importation of controlled substances enumerated in 21 U.S.C. §§ 841(a)(1), 952(a) and 963. (Affidavit ¶ 1). Agent Van Holsbeke outlines his employment background, training and experience investigating the smuggling of controlled substances. (Affidavit ¶ 2). Agent Van Holsbeke outlines the standard description of how drug smugglers, traffickers and dealers operate such that evidence of their operations can be found within the confines of residences. (Affidavit ¶ 3(a)-(e)).

On January 23, 2009, Agent Van Holsbeke testified he received information from a confidential informant of suspicious activity at 788 W. Calle Colado, Tucson, Arizona

---

[1]Agent Van Holsbeke has been employed by ICE since its inception in 2003 and in total for 12 years.

(hereinafter "the Premises" or "the Residence").[2] (January 23, 2009 Suppression Hearing (Doc. No. 34), at pp. 9-10 (hereinafter "Supp. Hrg. 1 at p._")).  However, the confidential informant was *not* a percipient witness to events at the Premises but had instead received information of alleged suspicious activity from someone else.(*Id.* at pp. 78-80)(emphasis added).

Agent Van Holsbeke testified that he was the only agent who surveilled the Premises on March 4, 2008. (*Id.* at pp. 19, 23, ). On March 4, 2008, he saw a blue and silver Ford F-150 (hereinafter "the pick-up") and a blue Pontiac Grand Am parked in the Residence driveway. (*Id.* at p. 14). He did not see anyone at the Premises. (*Id.* at p. 86). He did not see anyone coming to or going from the Premises. (*Id.* at p. 87). The only vehicular movement he saw was the blue Pontiac Grand Am leave at either 2:00 p.m. or perhaps in the evening. (*Id.* at pp. 17, 87). In either case, he did not see who was driving, did not know the gender of whoever was in the vehicle, and did not know how many people were in the vehicle. (*Id.* at p. 87).  He followed the blue Pontiac Grand Am to 6914 S. 8th Street, Tucson, Arizona but did not see who and how many individuals arrived there. (*Id*.). At approximately 6:00 to 6:30 p.m. he saw the pick-up in the backyard of the Premises backed up to the Residence. (*Id.* at p. 88). He did not see who had moved the pick-up (*Id.* at p. 18). He terminated surveillance at that time. (*Id.* at p. 19).

Agent Van Holsbeke determined through Tucson Electric Power that Ms. Felicitas Montanez (hereinafter "Ms. Montanez") had concurrent utilities subscriptions at the Residence and at 6914 S. 8th Street in Tucson, Arizona. He determined that the utilities at the Residence were activated on February 1, 2008 and were scheduled to be turned off on March 10, 2008. (*Id.* at pp. 11-12, 82). He concedes that it is not unusual for one to terminate utilities at one residence and start utilities at the next address where one will be living. (*Id.* at pp. 82-83). He determined that the owners of the Premises are Carlos and Dora Gutierrez

---

[2]788 W. Calle Colado is on the northeast corner of W. Calle Colado, which runs east and west, and S. Santa Clara Avenue, which runs north and south.

1   (*Id.* at p. 83); the utilities subscriber at the Premises immediately prior to Ms. Montanez

2   were Carlos and Dora Gutierrez (*Id.*); and the owner of the blue Pontiac Grand Am seen at

3   the Premises on March 4, 2008, and followed to 6914 S. 8th Street where Ms. Montanez also

4   subscribed utilities, are Carlos and Dora Gutierrez.  (*Id.* at p. 16).

5        On March 5, 2008, Agent Van Holsbeke arrived in the neighborhood of the Premises

6   at approximately 8:00 to  8:30 a.m. (*Id.* at p. 90). Up until 11:00 a.m. when a "knock and

7   talk" was attempted, Agent Van Holsbeke was the only agent conducting surveillance of the

8   Premises. (*Id.* at p. 89). Agent Van Holsbeke drove by the Premises twice that morning and

9   on both occasions saw the pick-up parked in front of the Residence. (*Id.* at pp. 19-20,90). He

10  did not see when the pick-up left the Premises that morning nor who was in it. (*Id.* at pp. 95-

11  96). He met with other agents for a debriefing  regarding the situation. When he and the other

12  agents arrived in the neighborhood of the Premises, the pick-up was parked in front of the

13  Residence. (*Id.* at pp. 23, 99). He did not see when the pick-up returned nor who had arrived

14  in it. (*Id.* at p. 100). Before he approached the Residence, the pick-up was observed leaving

15  the Residence and the driver was talking on a cell phone. (*Id.*).

16       On March 5, 2008, prior to the attempted "knock and talk", Agent Van Holsbeke

17  surveilled the Residence observing an Isuzu Rodeo parked at the Residence, ran the

18  temporary license plate and determined that it was registered to Defendant. (*Id.* at p. 22). On

19  March 5, 2008, at approximately 11:00 a.m.,[3] Agents Van Holsbeke[4] and Avneri, and Officer

20  Moreno along with other agents went to the Premises to conduct a "knock and talk."

21       Agents Van Holsbeke and Avneri  along with Officer Moreno and his narcotics

22  detection canine approached the front door of the Residence to conduct a "knock and talk."

23

24

---

25      [3]Agent Van Holsbeke completed and signed the Spanish-language Renunciation of

26  Rights form indicating that Defendant was arrested and detained at 11:00 a.m. on March 5, 2008. (Supp. Hrg.1 at p. 57; Supp. Hrg. 2 at pp. 21-23; Defendant Exh. E).

27      [4]Agent Van Holsbeke was the lead agent in the investigation of 788 W. Calle Colado

28  in March of 2008.

1  (*Id.* at pp. 28, 30-31, 33). With the solid front door open Agent Van Holsbeke could see

2  through the screen door. (*Id.* at p. 33). Agent Van Holsbeke testified:

> People that utilize stash houses are typically sparsely decorated
> with furniture or anything of - - of that nature. Also given the
> fact that over the course of the two days that I'd watched the
> house I had not seen any furniture or anybody moving stuff out
> of it that would lead me to believe that somebody was moving
> out and the state of disarray from what briefly I could see
> through the door with *what appeared to be children's toys* and
> trash and assorted things scattered all over the floor, seemed like
> if there was somebody living there, *they were either in the*
> *process of moving out* or weren't keeping the house in - -
> keeping the house together.

9  (*Id.* at p. 36; *see also* p. 108)(emphasis added). However, he could not see anyone or hear

10  anyone inside.(*Id.* at p. 37; February 13, 2009 Suppression Hearing (Doc. No. 47), at p. 33

11  (hereinafter "Supp. Hrg. 2 at p._")). Prior to Agent Van Holsbere almost getting to the front

12  door he heard someone shouting "Stop, police, stop." (Supp Hrg. 1 at p. 33). Agents Van

13  Holsbeke and Avneri ran to the west side of the Residence and were told that someone had

14  run out and back inside. (*Id.* at pp .35, 105). A male wearing blue jeans and a long-sleeved

15  white t-shirt was seen running from the back of the Residence to the north boundary fence

16  of the property and back to the Residence after agents shouted.[5] When Agent Van Holsbeke

17  went to the west side of the Residence, he observed two males receiving instruction from ICE

18  Agent Shanley to walk to his location at the west boundary fence of the premises with their

19  hands up.[6] These two males were soon thereafter handcuffed by Agent Shanley. (Supp. Hrg.

20  2 at pp. 66-67).

21      In the meantime, Officer Moreno stayed at the front door with his canine. (Supp. Hrg.

22  1 at pp. 105, 107). Officer Moreno is a police officer with the Marana Police Department and

23  is a certified dog handler. (Supp. Hrg. 2 at p. 73). He was called by Agent Van Holsbeke to

---

26  [5]Agent Shanley did not see which back door this male had exited from or the door this
male ran back into. (Supp. Hrg. 2 at p. 64).

28  [6]Agent Shanley does not know out of which back door these two males exited from
into the backyard. (Supp. Hrg. 2 at p. 64)

assist in a "knock and talk" with his narcotics detection canine. (*Id.* at pp. 74-75). Narcotics detection canines can react to the presence of narcotics passively i.e. sitting, or aggressively i.e., scratching and/or barking. (*Id.* at p. 75). Officer Moreno's canine is trained to react aggressively. (*Id.*). When approaching the front door of the Residence, Officer Moreno's canine was alert and aware of his surroundings. (*Id.* at p.80). Officer Moreno's canine did not bark or act up but, rather, stayed calm. (*Id.* at pp. 80-81). Agents Van Holsbeke and Avneri left for the west side of the Residence while Officer Moreno and his canine remained a few feet from the front door. (*Id.* at pp. 81, 96). During this time Officer Moreno's canine remained calm. (*Id.* at p. 83). Officer Moreno was not concerned that his canine did not alert. (*Id.* at p. 97). He did not give his canine a cue to begin searching nor did he focus his attention on any change in his canine's behavior. (*Id.*). Officer Moreno concedes that his canine could have alerted if there was a large amount of marijuana, and has done so recently without a cue, but it did not do so at the front door in this case. (*Id.* at pp. 97, 98).

Agent Van Holsbeke returned to the front of the Residence and continued walking easterly to the carport area and as he rounded the corner to walk into the carport he smelled marijuana. (Supp. Hrg. 1 at pp. 38-39). Agent Van Holsbeke also testified:

> Q. [Defense Counsel] All right. And Exhibit D is actually the door that we're talking about that you approached on - - which is in the carport; is that correct?
> A. [Agent Van Holsbeke] Correct.
> Q. And I believe your testimony was that as you came around the corner of the house towards that door is when you first smelled marijuana?
> A. Correct.
> Q. Burning marijuana.
> A. Correct.
> Q. *Prior to that you had not smelled it?*
> A. *No.*
> Q. *Had any of your fellow agents said to you I smell marijuana?*
> A. Not to my recollection.

(*Id.* at p. 109)(emphasis added)..

Agent Van Holsbeke went to a carport storage room door, knocked and announced himself as "Police" at which time the door opened and he smelled burning marijuana. (*Id.* at pp. 40-41). Agent Van Holsbeke instructed the person opening the door, Defendant Julio

1    Alfonso Valenzuela-Espinoza who matched the description of the male earlier described as

2    running,  to step out of the carport storage room into the carport. (*Id.* at pp.110-111).

3           Agent Van Holsbeke immediately asked Defendant: (1) if he lived at the Residence;

4    (2) because Defendant spoke no English, if he was a citizen of the United States; and (3) if

5    he was in the United States illegally. (*Id.* at pp. 36, 45, 114). Defendant answered that he was

6    a Mexican national here in the United States illegally. (*Id.*). Defendant was then arrested. (*Id.*

7    at p.46). Defendant was then entrusted to Officer Moreno who asked questions regarding

8    contraband, weapons, or anyone else in the Residence. (*Id.* at pp. 47- 49; Supp. Hrg 2 at pp.

9    14, 85, 94).

10          In the succeeding four hours Agent Van Holsbeke applied for, obtained, and served

11   a search warrant[7] at 4:00 p.m. at the Residence. (Def. Exh. A). In his experience the issuance

12   of the warrant in this instance was quick relative to others for which he has applied. (Supp.

13   Hrg. 2 at p. 37). Aside from the two males who had been arrested, detained and handcuffed

14   in the backyard and later brought through the carport storage room, no one went into the

15   carport storage room until the search warrant was served. (Supp. Hrg. 1 at p. 48; Supp. Hrg.

16   2 at pp. 34, 93).

17          Evidence obtained pursuant to the search warrant from the Residence was: (1) 99.75

18   kilograms of marijuana; (2) a FMJ Cobray .45/.22 caliber handgun, serial number

19   EOOOO8531;  (3) one digital scale; and (4) cellphones.

20   **IV.    DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR DUE PROCESS**

21   **AND SIXTH AMENDMENT VIOLATION**

22          The Court has reviewed testimony given by Immigration and Customs Enforcement

23   Agent Van Holsbeke at the *Franks v. Delaware*, 438 U.S. 154 (1978) hearing held on April

24   21, 2009. Defendant's claims that AUSA Woolridge "knew of perjury committed", or

25   "knowingly presented or used perjured testimony" is entirely without merit. Agent Van

26   Holsbeke submitted the Affidavit to AUSA Woolridge in the same apparent form submitted

27

28          [7]Search Warrant Case No. 08-00092M was issued at 3:25 p.m.

1   to the Court on March 5, 2008 and recalls no corrections or deletions made. (April 21, 2009

2   *Franks* Hearing (Doc. No. 68)-Agent Van Holsbeke Testimony at pp. 11-12 (hereinafter

3   "*Franks* Hrg at p. __")). Defendant's allusion to Agent Van Holsbeke's belief that he shared

4   information with AUSA Woolridge regarding a confidential informant as the source of

5   information regarding "suspicious activity" at the Residence disingenuously omits that Agent

6   Van Holsbeke cannot recall if he did in fact share such information. (*Id.* at p. 63). Defendant

7   alludes to alleged collusion between Agent Van Holsbeke and AUSA Woolridge to keep

8   from the Court or the Grand Jury that a confidential informant spurred the investigation of

9   the Residence based on second-hand information. The Court finds that this information is not

10  material in anyway to the charges filed against Defendant. *United States v. Basurto*, 497 F.2d

11  781, 785-786 (9th Cir 1974); *United States v. Kaplan*, 554 F.2d 958, 970 (9th Cir. 1977) (per

12  curiam), *cert. denied*, 429 U.S. 956 ("We can no more assume exculpation than we can

13  materiality").  Such information, revealed or not to the Grand Jury, does not bear upon the

14  determination of probable cause made by the Grand Jury. Moreover, a review of Agent Van

15  Holsbeke's testimony before the Grand Jury does not reveal overreaching or deception, such

16  as perjured testimony having been knowingly presented. *United States v. Thompson*, 576

17  F.2d 784, 786 (9th Cir. 1978); *United States v. Kennedy*, 564 F.2d 1329, 1335-1338 (9th Cir.

18  1977).

19       Defendant has failed to present any evidence that perjured testimony was presented

20  to the Grand Jury by Agent Van Holsbeke, let alone that AUSA Woolridge was complicit in

21  any way in attempts to suborn such. It is the recommendation of the Magistrate Judge that

22  Defendant's Motion To Dismiss Indictment For Due Process And Sixth Amendment

23  Violation (Doc. No. 71) be summarily denied.

24  **V.   DEFENDANT'S  MOTION  TO  SUPPRESS  FOR  *McNABB-MALLORY***

25       **VIOLATION**

26       Defendant was arrested at approximately 11:15 a.m. on Wednesday, March 5, 2008

27  at the Premises. Presentment of a defendant to a magistrate judge at the U.S. District Court

28

1   in Tucson, Arizona occurs on a daily-scheduled basis at 2:00 p.m. Defendant was detained

2   at the Premises during which time Agent Van Holsbeke prepared an application and Affidavit

3   that was presented to the Magistrate Judge at 3:25 p.m. The search warrant was served at the

4   Residence at approximately 4:00 p.m. After a search of the Residence and vehicles at the

5   Premises was conducted and evidence secured and documented, Defendant was brought to

6   the ICE station located near Valencia and Country Club Road in Tucson, Arizona, and

7   advised of his *Miranda* rights at 7:32 p.m.  Questioning of Defendant continued until 7:50

8   p.m. During this time Defendant made incriminating statements. During this time Defendant

9   vacillated regarding talking to an attorney. Upon unequivocally asking for an attorney at 7:50

10  p.m., questioning by Agent Van Holsbeke ceased.  Defendant was presented to a magistrate

11  judge on Thursday March 6, 2008 at 2:00 p.m.

12        The U.S. Supreme Court has held that, under 18 U.S.C. 3501(c):

13              a district court with a suppression claim must find whether the
        defendant confessed within six hours of arrest (unless a longer
14              delay was "reasonable considering the means of transportation
        and the distance to be traveled to the nearest available
15              [magistrate]"). If the confession came within that period, it is
        admissible, subject to the other Rules of Evidence, so long as it
16              was "made voluntarily and ...the weight to be given [it] is left to
        the jury."...If the confession occurred before presentment and
17              beyond six hours, however, the court must decide whether
        delaying that long was unreasonable or unnecessary..., and if it
18              was, the confession is to be suppressed.

19   *Corley v. United States*, __ U.S. __, 129 S.Ct. 1558, 1571 (April 6, 2009).

20        The fiction of Defendant's detention at 11:15 a.m. on March 5, 2008 is that he was

21  under arrest for being in the United States illegally. This position is belied by the reality that

22  Defendant was arrested and detained for knowingly and intentionally possessing with the

23  intent to distribute marijuana, as evidenced by: (1) Agent Van Holsbeke's narrative in the

24  Affidavit describing events alleged to have occurred prior to Defendant's arrest, to support

25  probable cause to search the Residence for evidence of drug trafficking; (2) Defendant's

26  arrest for being in the United States illegally at 11:15 a.m. but being asked questions

27  regarding the presence and quantity of drugs in the Residence; (3) invocation by Agent Van

28  Holsbeke of Defendant's responses at 11:15 a.m. to those questions in the Affidavit to

support probable cause to search the Residence for evidence of drug trafficking; (4) any number of available agents present at the Residence after Defendant's arrest to bring Defendant the brief twenty-minute, ten-mile drive to the U.S. District Court for a 2:00 p.m. daily-scheduled initial appearance for being in the United States illegally; (5)  Defendant's detention at the Residence until after Agent Van Holsbeke executed the search warrant at 4:00 p.m. at the Residence and searched for, secured and documented evidence; (6) Agent Van Holsbeke personally taking Defendant to the ICE station for questioning at 7:32 p.m.; and (7) the focus of Agent Van Holsbeke's questioning of Defendant at the ICE station was enlisting Defendant's cooperation in investigating drug trafficking related to the Residence.

For the aforesaid reasons, Defendant's detention for eight hours fifteen minutes (11:15 a.m. to 7:32 p.m.) in order to question him regarding drug trafficking was beyond the six hour "safe harbor" of 18 U.S.C. §3501(c), and unreasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate judge. It is the recommendation of the Magistrate Judge that Defendant's Supplemental Memorandum In Support Of Motion To Suppress For *McNabb-Mallory* Violation (Doc. No. 56) be granted and incriminating statements made at 7:32 p.m. to 7:50 p.m. on March 5, 2008 at the ICE station be suppressed.

**VI.     DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS AS  TAINTED BY AN ILLEGAL SEARCH AND SEIZURE AND FOR DUE PROCESS  AND *MIRANDA* VIOLATIONS**

Agent Van Holsbeke avowed in the Affidavit:

> The one subject wearing the white long sleeve t-shirt told TFO Officer Frank Moreno that inside the main house was "a lot" of marijuana. TFO Moreno asked this individual if the amount if [sic] marijuana inside was more than ten pounds to which the subject nodded his head in the affirmative.

(Affidavit ¶ 10).

Agent Van Holsbeke, accompanied by ICE Agent Avneri and Officer Moreno along with his narcotics detecting canine, did not need probable cause to go to the front door of the Residence with the intent of asking questions of the occupants and such has been a long-

1   standing principle. *Davis v. United States*, 327 F.2d 301 (9th Cir. 1964). Agent Van Holsbeke

2   did not consider applying for a search warrant because he did not have probable cause to

3   believe that crime was afoot. (Supp. Hrg. 2 at p. 6). He and other agents went to the

4   Residence to see whether there was any validity to the secondhand information he had

5   received regarding narcotics smuggling. (Supp. Hrg. 1 at p.9).

6        At the moment a person was seen running from the back of the Residence Agent Van

7   Holsbeke abandoned the attempted "knock and talk." (*Id.* at pp. 46-47; Supp. Hrg. 2 at p. 83).

8   Two other males, who were not running, were detained when they came out the back. (Supp.

9   Hrg. 2 at pp. 53-54). It was Agent Shanley's and other agents' roles to position themselves

10  outside the perimeter of the residential property to keep people from leaving. (Supp. Hrg. 1

11  at p. 34; Supp. Hrg. 2 at p. 60). This was accomplished by Agent Shanley specifically

12  drawing his service firearm, ordering the two males to put their hands up, and handcuffing

13  both men. (Supp. Hrg. 2 at pp. 65-67).

14       Upon hearing an agent shout "Stop. Police. Stop" Agent Van Holsbeke ran to the

15  westside of the Residence and saw the two males walking towards Agent Shanley with their

16  hands up. (Supp. Hrg. 1 at pp. 33-34, 105-107). He was told that someone had tried to run

17  and ran back inside. (*Id.* at p. 35). Agent Van Holsbeke returned to the front of the

18  Residence and continued to the carport. He knocked on the carport storage room door two

19  or three times while announcing himself as "Police." (*Id.* at p. 110; Supp. Hrg. 2 at p. 13).

20       Agent Van Holsbeke had previously seen Defendant in the backyard the morning of

21  March 5, 2008 watering the ground. (Supp. Hrg. 1 at pp. 20, 41). A person matching the

22  description of Defendant was seen running out the back. (*Id.* at pp.110-111).

23               Q. [AUSA] Why did you approach the *second door*? And *I'm
               referring to the door in the carport area.*
24             A. [Agent Van Holsbeke] Because I was getting no response at
               the *front door* and could clearly see inside and couldn't hear or
25             see anybody in there and *that was not the area that the - - that
               Mr. Valenzuela was observed running into.*
26

27  (Supp. Hrg. 2 at p. 33)(emphasis added). Defendant was the person seen running out the back

28  wearing blue jeans and a long sleeved white t-shirt. (Affidavit ¶ 8). Agent Van Holsbeke

knocked on the second door in the area where Defendant was observed running from and Defendant answered the door. (*Id.* at ¶ 9). Agent Van Holsbeke, identified himself as a police officer, immediately had conversation with Defendant regarding his status in the United States. (Supp. Hrg. 1 at pp. 41, 114). Determining Defendant was here illegally Agent Van Holsbeke arrested Defendant. (*Id.* at p. 46).

A seizure occurs when law enforcement through coercion, physical force, or a show of authority, in some way restricts the liberty of a person. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1325 (9th Cir. 1997). That liberty is restrained when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991)(quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988), and *citing California v. Hodari D*. 499 U.S. 621, 628 (1991)). Five factors that aid in determining this restraint of liberty are:(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee if his right to terminate the encounter. *Orhorhaghe v. INS*, 38 F.3d 488, 494-96 (9th Cir. 1994).

Under the circumstances described in the instant case, this Court can only conclude that Defendant was seized and a reasonable person in his position would not have felt "at liberty to ignore the police presence and go about his business." *Bostick,* 501 U.S. at 437. A seizure, as here, premised on reasonable suspicion to believe crime may be afoot is not *per se* unconstitutional under the Fourth Amendment provided it is sufficiently brief and minimally intrusive. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985). The officer is permitted to stop a person for a brief time and take additional steps to investigate further. *Terry v. Ohio*, 392 U.S. 1 (1968). Herein, once Defendant stepped out of the carport storage room he voluntarily consented to Agent Van Holsbeke's attempt at a brief and minimally intrusive *Terry*-stop. *United States v. Washington*, 387 F.3d 1060, 1069 (9th Cir. 2004).

1    The test for determining when a *Terry*-stop becomes an arrest is whether the detention

2    exceeded a brief stop, interrogation and, under proper circumstances a brief check for

3    weapons. If the stop proceeds beyond these limitations, an arrest has occurred if, under the

4    circumstances, a reasonable person would conclude that he was not free to leave after brief

5    questioning. *United States v. Bravo*, 295 F.3d 1002, 1011 n. 8 (9th Cir. 2002)(citing *United*

6    *States v. Miles* 247 F.3d 1009, 1012 (9th Cir. 2001)). Asking questions in the course of an

7    investigation regarding identification is a routine and accepted part of *Terry*-stops. *United*

8    *States v. Hensley*, 469 U.S. 221, 229 (1985)("[T]he ability to briefly stop [a suspect], ask

9    questions, or check identification in the absence of probable cause promotes the strong

10   government interest in solving crimes and bringing offenders to justice"); *Hayes v. Florida*,

11   470 U.S. 811, 816 (1985)("[I]f there are articulable facts supporting a reasonable suspicion

12   that a person has committed a criminal offense, that person may be stopped in order to

13   identify him, to question him briefly, or to detain him briefly while attempting to obtain

14   additional information."); *Adams v. Williams*, 407 U.S. 143, 146 (1972)("A brief stop of a

15   suspicious individual, in order to determine his identity or to maintain the status quo

16   momentarily while obtaining more information, may be most reasonable in light of the facts

17   known to the officer at the time."); *see also INS v. Delgado*, 466 U.S. 210, 216

18   (1984)("[I]nterrogation relating to one's identity or a request for identification by the police

19   does not, by itself, constitute a Fourth Amendment seizure.").

20       Here, Agent Van Holsbeke questioned Defendant regarding his identity and placed

21   him under arrest after determining that Defendant was in the United States illegally. Once

22   Agent Van Holsbeke placed Defendant under arrest, Defendant's freedom of movement was

23   deprived in a significant way. Under these circumstances agents were obligated to administer

24   *Miranda* warnings before proceeding with further questioning of Defendant. *Illinois v.*

25   *Perkins*, 496 U.S. 292, 296 (1990).[8] Nonetheless, Officer Moreno proceeded to question

26

27       _____

28       [8]The Government "is not seeking to introduce the statement made by the [D]efendant
     while still at his residence, that there was more marijuana inside the house. Therefore, this

- 14 -

1   Defendant regarding the presence and quantity of marijuana within the Residence. It is the

2   recommendation of the Magistrate Judge that post-arrest statements by Defendant at the

3   Residence on March 5, 2008 be suppressed.

4   **VII. *FRANKS* HEARING**

5           There is, of course, a presumption of validity with respect to the
            affidavit supporting the search warrant. To mandate an
6           evidentiary hearing, the challenger's attack must be more than
            conclusory and must be supported by more than a mere desire to
7           cross-examine. There must be *allegations of deliberate
            falsehood or of reckless disregard for the truth*, and those
8           allegations must be accompanied by an offer of proof.  They
            should point out specifically the portion of the warrant affidavit
9           that is claimed to be false; and they should be accompanied by
            a statement of supporting reasons. Affidavits or sworn or
10          otherwise reliable statements of witnesses should be furnished,
            or their absence satisfactorily explained....The deliberate falsity
11          or reckless disregard whose impeachment is permitted...is only
            that of the affiant,.....[I]f these requirements are met, and if, *when
12          material that is the subject of the alleged falsity or reckless
            disregard is set to one side*, there remains sufficient content in
13          the warrant affidavit to support a finding of probable cause, no
            hearing is required. On the other hand, if *the remaining content
14          is insufficient, the defendant is entitled, under the Fourth and
            Fourteenth Amendments, to his hearing*.

15

16   *Franks v. Delaware*, 438 U.S. 154, 171-172 (1978)(emphasis added). Deliberate or reckless

17   material omissions of facts that tend to mislead are also grounds for a *Franks* hearing. *United*

18   *States v. Deleon,* 979 F.2d 761, 763 (9th Cir. 1992)(*citing United States v. Stanert*, 762 F.2d

19   775, 781 (9th Cir. 1985), *amended*, *rehearing denied*  769 F.2d 1410 (9th Cir. 1985) ("[T]he

20   Fourth Amendment mandates that a defendant be permitted to challenge a warrant affidavit

21   valid on its face when it contains deliberate or reckless omissions of facts that tend to

22   mislead.")).  "Where, as here, a warrant's validity is challenged for deliberate or reckless

23   omissions of facts that tend to mislead, the affidavit must be considered with the omitted

24   information included." *Deleon,* 979 F.2d at 764 (*citing United States v. Condo,* 782 F.2d

25   1502, 1506 (9th Cir. 1986)).

26

27   ────────────────────

28   Court does not need to address the admissibility of this statement." Government's Response
     To Defendant's Motion To Suppress Statements (Due Process, Miranda)(Doc. No.23, p.5).

1      On March 13, 2009 this Court ordered that counsel for the Government and

2   Defendant address and brief the applicability of *Franks v. Delaware*, 438 U.S. 154 (1978).

3   (Doc. No. 49). Defendant filed a Motion To Quash Warrant And Suppress All Evidence

4   Obtained Thereby As Tainted By An Illegal Search And Seizure; Request For *Franks*

5   Hearing; Memorandum (Doc. No. 50). The Government responded by Government's

6   Supplemental Memorandum In Response To Defendant's Motions to Suppress (Doc. No.

7   52). After review of respective counsel's memoranda the Court found that Defendant  made

8   a "substantial preliminary showing that a false statement knowingly and intentionally, or with

9   reckless disregard for the truth, was included by the affiant in the warrant affidavit"

10  necessitating a hearing. *Franks*, 438 U.S. at 155-156. A *Franks* hearing was set and heard

11  on April 21, 2009.

12      **A. The Affidavit**

13          **1. Agent Van Holsbeke's Source of Information**

14      Agent Van Holsbeke avowed in the Affidavit that:

15          [t]he facts supporting this affidavit are *based on interviews of*
            *witnesses*, conversations with other agents familiar with this
16          investigation and examination of reports and documents, which
            other Special Agents or I have obtained.
17
    (Affidavit ¶ 4)(emphasis added). Furthermore, he avowed in pertinent part:
18
            On March 4, 2008, ICE Special Agents of the Deputy Agent In
19          Charge (DSAC), Tucson, Arizona Office *received information*
            *concerning suspicious activity* occurring at the Premises.
20
    (Affidavit ¶ 6)(emphasis added).
21
22      Information concerning  suspicious activity was not a result of an interview with a

23  percipient witness to claimed suspicious activity. Rather, it was information given to Agent

24  Van Holsbeke by a confidential informant who had received information from someone else.

25  The distinct impression conveyed to the Court is that Agent Van Holsbeke interviewed a

26  witness to suspicious activity. This Court's review of the Affidavit interprets "based on

27  interviews of witnesses" to mean literally and exactly that**:** interviews with individuals who

28

have witnessed an event. Agent Van Holsbeke's explanation at the Franks hearing does not ring true:

> Q. [Defense Counsel] In paragraph number 4, you indicate that you base the information that you're conveying in the affidavit upon interviews with witnesses, agents, and reports; is that correct?
> A. [Agent Van Holsbeke] That's correct.
> Q. All right. Is one of the witnesses you're referring to in there the confidential informant that you described as a reliable confidential informant at the hearing on January 23rd of this year?
> A. I - - I generally mean in - - in this particular paragraph, *interview witnesses, I include that to mean other agents that have observed activity and/or have assisted me with the investigation.*
> Q. All right. *So you're not specifically referring there to a confidential informant?*
> A. *No.*
> Q. Now at the hearing January the 23rd, you indicated that in fact the information you had received was from a confidential informant.
> A. Correct.

(*Franks* Hrg. at p. 14)(emphasis added). Paragraph 4 of the Affidavit cannot be reasonably read to state as Agent Van Holsbeke now opines: "*based on interviews of agents*, conversations with other agents familiar with this investigation" in order to characterize the confidential informant as one not "interviewed" yet interviewing the confidential informant concerning "suspicious activity." It is incumbent upon a magistrate judge to consider all the circumstances set forth in an affidavit including the "veracity" and "basis of knowledge" of persons supplying information in order to have a substantial basis for concluding that probable cause exists. *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983). The Court was not able to establish information regarding the informant and/or his source's credibility or the reliability of the tip. *See United States v. Meling*, 47 F.3d 1546, 1554-55 (9th Cir. 1995).

The Court was not able to establish the informant and/or his source's basis of knowledge of suspicious activity or the presence of drugs at the Premises. See *e.g., Rugendorf v. United States*, 376 U.S. 528 (1964)(magistrate's determination that there was probable cause to believe that certain stolen property would be found at defendant's apartment upheld). The Court was not able to assess the informant and/or his source's

1    information as corroborated or not by Agent Van Holsbeke's own observations outlined in

2    the Affidavit. *See United States v. Celestine*, 324 F.3d 1095 (9th Cir. 2003); *United States v.*

3    *Bishop*, 264 F.3d 919 (9th Cir. 2001).

4           Given the informant's proffer of hearsay upon hearsay, the Court was not able to

5    determine whether such information was stale.[9] The test for staleness is whether the

6    information offered justifies a conclusion that the objects of the search are still on the

7    premises to be searched. *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991); *see* Fed. R.

8    Crim. P. 41(a)(search warrant shall allow the search to occur under a specified time not to

9    exceed 10 days). Unknown to the Court was whether the informant and/or his source  had

10   motivation to cast suspicion upon the Residence. Also unknown to the Court was whether

11   such source was anonymous to either the informant or to Agent Van Holsbeke. *See Gates*,

12   462 U.S. at 225 (an anonymous letter).

13          It is troubling to this Court that Agent Van Holsbeke first testified under oath at the

14   suppression hearing as follows:

15                  Q. [Defense Counsel] Okay. So someone actually called you and
                    said there's narcotics being smuggled?
16                  A. [Agent Van Holsbeke] Not exactly, no.
                    Q. *Did this person indicate how he or she came by this*
17                  *information?*
                    A. *No.*
18
19   (Supp. Hrg. 1 at p. 79)(emphasis added), but  later testified inconsistently under oath at the

20   *Franks* hearing:

21                  Q. [Defense Counsel] Did the informant tell you how he came
                    about that information?
22                  A. [Agent Van Holsbeke] Not that I recall exactly. He did- - did
                    not have firsthand knowledge. *I believe it was through other*
23                  *contacts that he had made.*

24

25   _____

26          [9]        Q. [Defense Counsel] Did [the confidential informant] explain
                    to you when he received that information from other contacts?
27                  A. [Agent Van Holsbeke] I don't recall. I presume it was
                    probably the same day.
28   (*Franks* Hrg. at pp. 17-18).

(*Franks* Hrg. at p. 17)(emphasis added). Agent Van Holsbeke's shifts in recollection erodes his credibility and places the Court in the quandary of when to believe or disbelieve his sworn-to testimony. Agent Van Holsbeke's failure to state that the "receipt of information concerning suspicious activity" at the Premises came from a confidential informant whose source was someone else is in reckless disregard of the truth. *Compare United States v. Hole*, 564 F.2d 298, 302 (9th Cir. 1977); *United States v. Botero*, 589 F.2d 430, 433 (9th Cir. 1978).

The Court is aware the Ninth Circuit has held that:

> *Franks* teaches that when [an affiant intentionally fails to properly identify the source of information]..., the warrant must be invalidated. The fact that probable cause did exist and could have been established by a truthful affidavit does not cure the error.

*United States v. Davis*, 714 F.2d 896, 899 (9th Cir. 1983)(footnote omitted). However, failure to disclose the existence of a confidential informant herein in the context of a "knock and talk" does not bolster nor diminish the existence of probable cause. Nonetheless, the distinct apocryphal impression the Court was given by Agent Van Holsbeke when reviewing the Affidavit was that he personally interviewed a witness with firsthand information. The Court finds this the first in a litany of instances where Agent Van Holsbeke is not credible. Consequently, pursuant to *Franks,* the Court will not consider and will excise from the probable cause equation[10] relevant portions in Paragraph 4 alluding to "interviews of witnesses" and relevant portions of Paragraph 6 alluding to "suspicious activity occurring at the Premises."

### 2. Agent Van Holsbeke's March 4th Observations

Agent Van Holsbeke avowed, in pertinent part, in Paragraph 6 of the Affidavit:

> Your Affiant drove by the PREMISES and observed two vehicles parked at the PREMISES. A blue and silver Ford F-150

---

[10]Pursuant to *Franks* and its progeny, the Court revises the Affidavit by excision of statements made in reckless disregard of the truth and insertion of omitted material and relevant information (hereinafter "Revised Affidavit").

pickup and a blue Pontiac Grand Am as described in paragraph 5. During the course of the surveillance *your Affiant observed several vehicles and subjects enter and exit the PREMISES*. The Blue Pontiac Grand Am was followed to a second residence located at 6914 S. 8th Street, Tucson, Arizona. *Utilities were checked through Tucson Electric Power and showed both residences were listed with Felicitas MONTANEZ as the current subscriber.*

(Affidavit ¶ 6)(emphasis added).

### a. Vehicles and Subjects Entering and Exiting

Agent Van Holsbeke as the only surveilling agent on March 4, 2008 did not "observe[] several vehicles and subjects enter and exit the Premises" and the only vehicle he saw leaving the Premises was the blue Pontiac Grand Am at 2:00 p.m., or in the evening, while not knowing the gender of the driver or potential other occupant(s). (Statement of Facts, *supra*, at p. 4). Agent Van Holsbeke as the only surveilling agent on March 5, 2008 did not see a pick-up backed up to the house in the backyard, but rather, saw it driven away shortly before the attempted "knock and talk."(Statement of Facts, *supra*, at p. 5).

On March 5, 2008, Agent Van Holsbeke presented the Court with the Affidavit wherein Paragraph 6 begins with a description of what transpired "On March 4, 2008, ...", and wherein Paragraph 7 begins with a description of what transpired "On March 5, 2008, ...."  Agent Van Holsbeke's Affidavit conveyed the clear impression that there was crime afoot with pedestrian and vehicular traffic seemingly suspicious of and associated with drug activity occurring over the course of two days.  Agent Van Holsbeke's explanation for the Affidavit markedly differing from his testimony is:

A. [Agent Van Holsbeke] Actually, now that I've had a chance to review this again, "During the course of the surveillance your affiant observed several vehicles and subjects enter and exit the premises," that statement is *a generalization to including [sic] during the entire course of the surveillance to include the two days.* It as not specific to that date, solely for March 4th.

(*Franks* Hrg. at p. 23)(emphasis added). The Court finds Agent Van Holsbeke not credible as to these events described in Paragraph 6 of the Affidavit as occurring and now attested to under oath as not so. *United States v. Hernandez-Acuna*, 498 F.3d 942, 944 (9th Cir. 2007).

1   This Court will not engage in revising the Affidavit to conform to what Agent Van Holsbeke

2   meant to convey. Agent Van Holsbeke's claim to have seen "several vehicles and subjects

3   enter and exit the PREMISES" on March 4, 2008 was in reckless disregard of the truth.

4   Consequently, the Court will not consider and will excise from Paragraph 6 of the Revised

5   Affidavit Agent Van Holsbeke's alleged observations of "several vehicles and subjects enter

6   and exit the PREMISES" and include instead that he observed "the blue Pontiac Grand Am

7   leave" the PREMISES.

8   ### b. Concurrent Utilities Subscription

9   Agent Van Holsbeke's proffer in the Affidavit of information limited to *only*

10   concurrent utilities subscriptions by Ms. Montanez omits material information then known

11   to him crucial to determining probable cause. Agent Van Holsbeke verified but failed to

12   inform the Court: (1) that the utilities were scheduled to be turned off on or about March 10,

13   2008; (2) that the owners of the Premises were the previous utilities subscribers to Ms.

14   Montanez; (3) that the owners of the Premises are the owners of the blue Pontiac Grand Am

15   seen at the Residence later driven to another residence where Ms. Montanez  had utilities

16   subscribed; and (4) that the interior of the Residence appeared as if someone, perhaps with

17   children, was moving as evidenced by toys in the front room of the Residence and an open-

18   bed pick-up backed up to the Residence in the backyard. (Statement of Facts, *supra,* at pp.

19   4-6; Supp. Hrg. 2 at pp. 36,  89). Agent Van Holsbeke's selective material omissions in

20   reckless disregard of the truth regarding these events in Paragraph 6 of the Affidavit further

21   lessens Agent Van Holsbeke credibility.  This omitted information will be included as

22   material information in Paragraph 6 of the Revised Affidavit to reflect ownership of the

23   Premises and the blue Pontiac Grand Am by Carlos and Dora Gutierrez.

24   ### 3. Agent Van Holsbeke's March 5th  Observations

25   Agent Van Holsbeke avowed in the Affidavit:

26   On March 5, 2008, your Affiant observed the blue and silver
    Ford F-150 parked in the backyard of 788 W. Calle Colado. *Also*

27   observed were two subjects in the backyard watering the ground
    with a garden hose. The blue silver Ford F-150 was then

28   observed leaving the residence. A short while later the Ford F-

1
2

> 150 returned to the residence and parked on the street. Your Affiant observed several subjects different from the subjects observed earlier in the front yard watering plants.

3  (Affidavit ¶ 7)(emphasis added).

4        On March 5, 2008, when Agent Van Holsbeke went to the area of the Premises to

5  begin surveillance he saw the pick-up parked in front of the Premises. (Statement of Facts,

6  *supra,* at p. 5). His statement in the Affidavit that he observed the pick-up in the backyard

7  is in reckless disregard of the truth. Avowing such in the Affidavit, followed immediately by

8  the sentence "*Also* observed were two subjects in the backyard watering the ground with a

9  garden hose[]" conveyed to the Court the impression that the pick-up parked in the backyard

10  and the two subjects watering the ground were contemporaneous and interrelated in

11  seemingly suspicious activity.  (Affidavit ¶7) (emphasis added). Agent Van Holsbeke

12  concedes that the two subjects and the pick-up were not in the backyard at the same time, but

13  still vacillates on the question of when and where the pick-up was seen:

14
15

> Q. [Defense Counsel] So which is it, did you see it on March the 4th or March the 5th or both days? I'm talking about the vehicle in the backyard.

16
17
18
19

> A. [Agent Van Holsbeke] *It's presumed* I - - *I don't recall*, sir, but I - - *it's very likely* that I did see it on March the 4th and March the 5th. The vehicle *was seen coming and going* during that - - during the course of surveillance *or at least seen parked* in several different locations around the property. *It is possible* then March the 5th early that morning it was in the backyard. I - - *I don't recall specifically*, but it was observed at the residence. *I may have made an error in the dates.*

20
21

> Q. Well, isn't it true, Agent Van Holsbeke, that the very next statement in paragraph 7 is that on March the 5th you see this Ford F-150 and you say "Also observed were two subjects in the backyard watering the ground with a garden hose'? That's accurate, isn't it?

22

> A. Yes.

23
24

> Q. Were you trying to convey to the magistrate that you saw these two subjects in the backyard at the same time that the Ford F-150 was in the back yard as well?

25

> A. No, *it's a poor choice of words*. They were not in the back [sic] the same time. That - - that is for sure

26  (*Franks* Hrg. at pp. 27-28)(emphasis added). Agent Van Holsbeke's claim in Paragraph 6 of

27  the Affidavit that on March 4 he had observed "several vehicles and subjects enter and exit

28  the PREMISES" in conjunction with the false impression of a pick-up and two subjects in

the backyard at the same time suggested activity seemingly associated with drug trafficking activity. By Agent Van Holsbeke's own sworn testimony, the only vehicles actually seen leaving was the blue Pontiac Grand Am on March 4 and the pick-up on March 5 just prior to the attempted "knock and talk."

Agent Van Holsbeke's observations of the activity at the Residence as something going on there "not[] of a suspicious nature" but significant only by what he had previously been told regarding narcotics smuggling. (Supp. Hrg. 1 at p. 18); or that "there was reasonable suspicion that something may or may not be occurring there." (*Id.* at p.97); or "given all the stuff together, there was something seemed to be occurring whether somebody was moving or if there was illegal activity going on, the reason why we decide to do a knock and talk just to dispel any - - any chance if there was something there or there wasn't[]" (*Id.*) are conclusory and unsubstantiated by his own factual observations.

Agent Van Holsbeke, as the *only* surveilling officer at the Residence over the course of a day and a half, left the Court dependent on his articulation and avowal to the truth and accuracy of the information contained in Paragraph 7 of the Affidavit. Agent Van Holsbeke's material misstatements and omissions in reckless disregard of the truth, further undermines his credibility and the Court will excise relevant portions and insert omitted material information regarding the location and movement of the pick-up in Paragraph 7 of the Revised Affidavit.

### 4. Agent Van Holsbeke's Attempted "Knock and Talk"

As a consequence of the aforesaid *Franks* excisions of statements and insertion of material omissions made in reckless disregard of the truth, Agent Van Holsbeke had not observed "suspicious activity" consistent with drug trafficking activity occurring from within the Residence up to when he attempted a "knock and talk."

Agent Van Holsbeke avowed in the Affidavit:

> At approximately 11:15 A.M., ICE Agents, assisted by an Agent of the Arizona Attorney's General's and a canine enforcement Tack Force Officer (TFO) from Marana Police Department attempted to speak with the occupants of the PREMISES. *Your Affiant and one other ICE Agent approached the front door and*

*could smell a very strong odor of marijuana coming from the*
*PREMISES.* As your Affiant was approaching the PREMISES,
ICE Agents watching the alleyway behind the house observed
one male subject wearing blue jeans and a long sleeved white t-
shirt attempt to run out the back door. ICE Agents identified
themselves as police and the subject turned and fled back into
the residence.

(Affidavit ¶ 8)(emphasis added).

Glaringly absent from Agent Van Holsbeke's account in the Affidavit regarding the approach to the front door of the Residence is that "a canine enforcement Task Force Officer (TFO) from Marana Police Department", i.e. Officer Moreno, accompanied him and Agent Avneri to the front door and the narcotics detection canine did not react to the strong odor of marijuana at the front door of the Residence. Considering this material omission it is difficult to fathom how Agent Van Holsbeke had a keener sense of smell than a canine trained to detect narcotics such that he "hit' while the canine did not. Perhaps the explanation is that the canine was not "cued" by his handler Officer Moreno to begin working. (Supp. Hrg. 2 at p. 97).

The claim by Agent Van Holsbeke that he "and one other ICE Agent [Avneri] approached the front door and could smell a very strong odor of marijuana coming from within the Premises" also conveys the distinct impression that both smelled marijuana. No agent at the Premises conveyed to Agent Van Holsbeke that he or she, too, smelled marijuana. (Supp. Hrg. 1 at p. 109). Agent Van Holsbeke, alone, smelling marijuana at the front door of the Residence, without more, would have been sufficient for a finding of probable cause to search the Residence. However, Agent Van Holsbeke did not smell any odor of marijuana at the front door of the Residence, but allegedly later in the area of the carport. (Statement of Facts, *supra,* at pp. 7-8; Supp. Hrg. 1 at p. 109).

Agent Van Holsbeke's testimony under oath at the suppression hearing on January 23, 2009 makes very clear that he, ICE Agent Avneri and Officer Moreno approached the front door of the Residence:

Q. [AUSA] Okay. So were - - were - - was there anyone else
other than the three, yourself, Officer Avneri, and Officer
Moreno, that approached the house?

> A. [Agent Van Holsbeke] No.
> Q. Okay. You mentioned through that - - you said through an open gate. Can you please describe the property itself, including any fence or - - or other structures?
> A. There was a small chainlink fence approximately maybe three feet high, maybe waist high with a small gate with a walkway leading from the sidewalk to *the front door*. There was another gate that was open along the driveway that led to the carport and the second - - the second parking area. Both of which were open. We walked through that open gate up to *the front door* to knock of [sic] the door

(Supp. Hrg. 1 at pp. 28-29).

At the *Franks* hearing regarding when and where he first smelled marijuana, Agent Van Holsbeke proffered, as explanation for the contradiction between the Affidavit and his sworn testimony at the suppression hearing, the following :

> Q. [Defense Counsel] So you weren't - - you couldn't smell the marijuana as you were approaching the front door, you didn't smell it until after or as you were approaching the door to the room underneath the carport; is that accurate?
> A. [Agent Van Holsbeke] Actually, the front door that I'm referring to in this one was the one under the carport, because there was obviously two front doors. I obviously made - - I should have clarified which front door I was specifically talking about.

(*Franks* Hrg.at p. 32).

What he meant to say is belied by his own hand drawn diagram of the Residence on the Premises, admitted into evidence as Government's Exhibit 1, wherein he denotes the front door but does not characterize the carport storage room door in any way. What he meant to say is belied by his sworn testimony at the suppression hearing:

> Q. [AUSA] Okay. After you heard the commotion in the back and you returned to the front of the house, what's the next thing that you did?
> A. [Agent Van Holsbeke] I continued to walk on the east side of the house *towards the carport* in the direction where the one individual who was observed running out of the house run back into *where I observed a second door* leading into what initially I thought was another part of the house but later turned out to be a storage unit, or a storage shed.

(Supp. Hrg.1 at p. 37)(emphasis added). What he meant to say is belied by his own avowal in the Affidavit that "ICE Agents knocked on *the second door* in the area where the subject was observed running from...." (Affidavit ¶ 9)(emphasis added). Agent Van Holsbeke's

avowal in the Affidavit that he smelled the strong odor of marijuana at the front door is disproved and made in reckless disregard of the truth and cannot now be reconciled with his disingenuous explanation at the *Franks* hearing. Agent Van Holsbeke's credibility is further eroded. The Court will excise relevant portions of Paragraph 7 of the Revised Affidavit alluding to smelling the strong odor of marijuana at the front door and will insert material omitted information regarding Officer Moreno and his narcotics detecting canine.

### 5. Agent Van Holsbeke At the Second Door

Agent Van Holsbeke avowed in the Affidavit:

> ICE Agents knocked on the second door in the area where the subject was observed running from and the same individual answered the door. As this subject opened the door your Affiant distinctly smelled *the source of the marijuana odor coming from this room*. There were two subjects in the room who were asked out of the house and detained.

(Affidavit ¶ 9)(emphasis added).

Agent Van Holsbeke testified under oath at the suppression hearing that he smelled the odor of burning marijuana in the carport. (Supp. Hrg. 1 at pp. 38-39, 109). Once the door was opened, marijuana smoke wafted out of the carport storage room. (*Id.* at pp. 40-41). An objective reading of the Affidavit submitted by Agent Van Holsbeke wherein he "distinctly smelled the *source* of the marijuana odor" is an unequivocal reference to Agent Van Holsbeke's earlier alleged "smell [of] a very strong odor of marijuana" at the front door. However, his testimony at the suppression hearing is that he did not smell marijuana at the front door.  (Supp. Hrg. 1 at p.109).  Agent Van Holsbeke cannot claim that he came upon the "source" of something that, by his own admission under oath at the suppression hearing, he never smelled. (Statement of Facts, *supra,* at pp. 7-8).

Agent Van Holsbeke's avowal in the Affidavit that he found the "source of the marijuana odor" is extremely troubling for another reason. Agent Van Holsbeke in the Affidavit alluded to a very strong *odor of marijuana* at the front door suggesting trafficking in quantity narcotics. Agent Van Holsbeke failed to inform the Court in the Affidavit that the solid front door was *open*. Agent Van Holsbeke in sworn testimony now claims to smell the

1  *odor of burning marijuana* in the carport. No such mention was made in the Affidavit. In his

2  Affidavit, Agent Van Holsbeke told the Court that when the carport storage room door, i.e.,

3  the second door, was opened, he smelled *the source of the marijuana odor*. The material

4  misstatement of "very strong odor of marijuana" at the front door and the material

5  misstatement of "the *source* of the marijuana odor coming" from the carport storage room

6  in the Affidavit created the necessary nexus between the carport storage room and the

7  Residence sought to be searched for evidence of quantity narcotics trafficking. Moreover,

8  this nexus sought to be advanced by Agent Van Holsbeke is that after Defendant opened the

9  door he was asked "to step out of the *house*." (Affidavit ¶ 9) (emphasis added). Yet, Agent

10  Van Holsbeke's reason for approaching the carport storage room door was because he was

11  getting no response at the front door of the residence "and that was not the area that the - -

12  that Mr. Valenzuela was observed running into." (Supp. Hrg.  2 at p. 33).  The smell of

13  burning marijuana once the carport storage room door was opened suggests marijuana use.

14  Given Agent Van Holsbeke's previously-described material misstatements and omissions in

15  reckless disregard of the truth regarding where he smelled marijuana, this Court disbelieves

16  that Agent Van Holsbeke smelled burning marijuana in the carport through a *closed* solid

17  door of the carport storage room. (Supp. Hrg. 1 at p. 110).

18      As previously discussed, Agent Van Holsbeke  had no information, other than

19  secondhand information that there was marijuana in the Residence.

20  　　　　[I]t cannot follow in all cases, simply from the existence of
　　　　probable case to believe a suspect guilty, that there is also
21  　　　　probable cause to search his residence. If that were so, there
　　　　would be no reason to distinguish search warrants from arrest
22  　　　　warrants, and cases like *Chimel v. California*, 395 U.S. 752, 89
　　　　S.Ct. 2034, 23 L.Ed.2d 685 (1969), would make little sense.
23

24  *United States v. Hendricks* 743 F.2d 653, 655 (9th Cir. 1984).To justify the search of a

25  residence, the facts supporting the warrant must show probable cause to believe that the

26  evidence sought is currently in the place to be searched. *See United States v. Foster*, 711 F.2d

27  871 (9th Cir. 1983), *cert. denied*, 465 U.S. 1103 (1984); *United States v. Valenzuela*, 596 F.2d

28  824 (9th Cir. 1979), *cert. denied*, 441 U.S. 965 (1979). The nexus between the carport storage

room and Residence created by Agent Van Holsbeke's material misstatement in reckless disregard of the truth is obviated by omission of a not insignificant fact**:** There is a solid wall between the carport storage room and the Residence with no access from one into the other. The carport storage room is not connected to the Residence. (Supp. Hrg. 2 at p. 34). Neither the odor of raw or burning marijuana could permeate into the Residence. The Court will excise from Paragraph 9 of the Affidavit the statement made in reckless disregard of the truth of "distinctly smell[ing] the source of the marijuana" and will insert information regarding the odor of burning marijuana.

## **6. Defendant's Statements**

Agent Van Holsbeke secured the perimeter of the Residence because the Defendant was taken into custody and Agent Van Holsbeke could not obtain consent from him.  (Supp. Hrg. 1 at p. 46). Agent Van Holsbeke did not advise Defendant of his *Miranda* rights although he had the capability to do so. (Supp. Hrg. 2 at pp. 39). He may have held Defendant by the arm as he handed him over to Officer Moreno. (*Id.* at p. 14). Officer Moreno then proceeded to question Defendant regarding people, weapons, or drugs in the Residence. (*Id.* at p. 85):

> Q. [AUSA] Just have just a few follow-up questions with regard to that - - that last area. Other than asking the individual who you spoke with, you know, if there were any other people or contraband at the house, *did you do anymore questioning like to determine his involvement or everything he knew or anything like that?*
> A. *No, ma'am.*
> Q. Other than that initial question to ascertain basically the situation, what was going on, did you question him any further or question anyone else?
> A. No, ma'am.

(*Id.* at p. 94)(emphasis added). Statements ascribed to Defendant in the Affidavit without the benefit of *Miranda* clearly indicate that Defendant was questioned about what he knew, i.e. that there was "a lot" of marijuana inside the Residence and nodding affirmatively when asked if it was more than 10 pounds.

> The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. *United States v. Driver*, 776 F.2d 807 (9th Cir. 1985). A

> reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant. *Id.*

*United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987). Defendant has established by a preponderance of the evidence that Affiant Agent Van Holsbeke, in reckless disregard of the truth, made both material misstatements and omissions in the Affidavit in Support of Search Warrant Case No. 08-00092M. The Court will excise from Paragraph 10 of the Affidavit statements made by Defendant without benefit of *Miranda* after being arrested and placed in custody at the Residence.

**B. Modifications To Affidavit**

Based upon the aforesaid analysis the Court will excise[11] inapposite portions and will insert[12] relevant portions in Paragraphs 4 through 11 of the Affidavit as follows:

4.      The facts supporting this affidavit are based on ~~interviews of witnesses~~ conversations with other agents familiar with this investigation and examination of reports and documents which other Special Agents or I have obtained.

5. Your Affiant states the facts tending to establish probable cause for the issuance of a Search Warrant to search the premises located at 788 W. Calle Colado, Tucson, Arizona, described as a single family residence, single story, light tan stucco home, with the numbers 788 in the middle of the premises, HEREINAFTER KNOWN AS THE PREMISES, there are also two vehicles in the carport a white Isuzu Rodeo and a blue Pontiac Grand Am bearing Arizona license 408-TSN are as follows:

6.      On March 4, 2008, ~~ICE Special Agents of the Deputy Special Agent in~~

---

[11]Excisions will be denoted with strikeouts, e.g., ~~example~~.

[12]Insertions will be denoted in boldface, e.g., **example**.

1    ~~Charge (DSAC), Tucson, Arizona Office received information concerning~~

2    ~~suspicious activity occurring at the Premises.~~ **You're your** Affiant drove by

3    the PREMISES, **owned by Carlos and Dora Gutierrez**, and observed two

4    vehicles parked at the PREMISES~~:~~**.** A blue and silver Ford F-150 pickup and

5    a blue Pontiac Grand Am as described in Paragraph 5~~:~~ **owned by Carlos and**

6    **Dora Gutierrez**. During the course of the surveillance your Affiant observed

7    ~~several vehicles and subjects enter and exit~~ **the blue Pontiac Grand Am leave**

8    the PREMISES. The blue Pontiac Grand Am was followed to a second

9    residence located at 6914 S. 8th Street, Tucson, Arizona. Utilities were checked

10   through Tucson Electric Power and showed both residences were listed with

11   Felicitas MONTANEZ as the current subscriber. **The utilities at the**

12   **PREMISES were activated on February 1, 2008 and were scheduled to**

13   **end on March 10, 2008.**

14   7.      On March 5, 2008, your Affiant observed the blue and silver Ford F-

15   150 parked in ~~the backyard of 788 W. Calle Colado~~ **front of the PREMISES**.

16   ~~Also observed were two~~ **Two** subjects **were observed** in the backyard

17   watering the ground with a garden hose. The blue silver Ford F-150 was **later**

18   ~~then~~ observed leaving the ~~residence~~ **PREMISES**. ~~A short while later the Ford~~

19   ~~F-150 returned to the residence and parked on the street.~~ Your Affiant

20   observed ~~several~~ **two** subjects different from the subjects observed earlier in

21   the front yard watering some plants.

22   8.      At approximately 11:15 a.m., ICE Agents, assisted by an Agent of the

23   Arizona Attorney's General's and a canine enforcement Task Force Officer

24   (TFO) from Marana Police Department attempted to speak with the occupants

25   of the PREMISES. Your Affiant and one other ICE AGENT **along with the**

26   **TFO and his narcotics detection canine** approached the front door **of the**

27   **residence** ~~and could smell a very strong odor of marijuana coming from the~~

28   ~~PREMISES.~~ As your Affiant was approaching the ~~PREMISES~~ **residence**, ICE

1  Agents watching the alleyway behind the house observed one male subject

2  wearing blue jeans and a long sleeved white t-shirt attempt to run out the back

3  door **of a carport storage room**. ICE Agents identified themselves as police

4  and the subject turned and fled back into the ~~residence~~ **carport storage room**.

5  9.     ~~ICE Agents~~ **Your Affiant** knocked on the ~~second door in the area~~ **front**

6  **door of the carport storage room** where the subject was observed running

7  from and the same individual answered the door. As this subject opened the

8  door your Affiant ~~distinctly~~ smelled the ~~source of the marijuana~~ odor **of**

9  **burning marijuana** coming from this **carport storage** room. ~~There were two~~

10  ~~subjects in the room who~~. **This subject and another individual** were asked

11  to step out of the ~~house~~ **carport storage room** and detained. **This room is**

12  **inaccessible from and to the residence on the PREMISES.**

13  ~~10.     The one subject wearing the white long sleeve t-shirt told TFO Officer~~

14  ~~Moreno that inside the main house was "a lot" of marijuana. TFO Moreno~~

15  ~~asked this individual if the amount if marijuana inside was more than ten~~

16  ~~pounds to which the subject nodded his head in the affirmative.~~

17  ~~11.~~10. Based on this Affiants experience and the facts stated in this affidavit

18  I believe there is probable cause to search ~~THE PREMISES~~ **the residence** and

19  any vehicles on the PREMISES or those items listed on Attachment A which

20  is incorporated by reference to search for marijuana, marijuana packaging,

21  drug paraphernalia, indicia of residency, indicia of ownership of the two

22  vehicles.

23  **C. Revised Affidavit**

24  The Revised Affidavit sans deleted inapposite portions with inserted relevant portions

25  in Paragraphs 4 through 11 of the Affidavit reads as follows:

26  4.     The facts supporting this affidavit are based on conversations with other

27  agents familiar with this investigation and examination of reports and

28  documents which other Special Agents or I have obtained.

5.      Your Affiant states the facts tending to establish probable cause for the issuance of a Search Warrant to search the premises located at 788 W. Calle Colado, Tucson, Arizona, described as a single family residence, single story, light tan stucco home, with a number 788 in the middle of the premises, HEREINAFTER KNOWN AS THE PREMISES, there are also two vehicles in the carport a white Isuzu Rodeo and a blue Pontiac Grand Am bearing Arizona license 408-TSN are as follows:

6.      On March 4, 2008, your Affiant drove by the PREMISES owned by Carlos and Dora Gutierrez, and observed two vehicles parked at the PREMISES a blue and silver Ford F-150 pickup and a blue Pontiac Grand Am as described in Paragraph 5 owned by Carlos and Dora Gutierrez. During the course of the surveillance your Affiant observed the blue Pontiac Grand Am leave the PREMISES. The blue Pontiac Grand Am was followed to a second residence located at 6914 S. 8th Street, Tucson, Arizona. Utilities were checked through Tucson Electric Power and showed both residences were listed with Felicitas MONTANEZ as the current subscriber. The utilities at the PREMISES were activated on February 1, 2008 and were scheduled to end on March 2008.

7.      On March 5, 2008, your Affiant observed the blue and silver Ford F-150 parked in front of the PREMISES. Two subjects were observed in the backyard watering the ground with a garden hose. The blue silver Ford F-150 was later observed leaving the PREMISES. Your Affiant observed two subjects different from the subjects observed earlier in the front yard watering some plants.

8. At approximately 11:15 a.m., ICE Agents, assisted by an Agent of the Arizona Attorney's General's and a canine enforcement Task Force Officer (TFO) from Marana Police Department attempted to speak with the occupants of the PREMISES. Your Affiant and one other ICE Agent along with the TFO

and his narcotics detection canine approached the front door of the residence. As your Affiant was approaching the residence, ICE Agents watching the alleyway behind the house observed one male subject wearing blue jeans and a long sleeved white t-shirt attempt to run out the back door of a carport storage room. ICE Agents identified themselves as police and the subject turned and fled back into the carport storage room.

9.      Your Affiant knocked on the front door of the carport storage room where the subject was observed running from and the same individual answered the door. As this subject opened the door your Affiant smelled the odor of burning marijuana coming from this carport storage room. This subject and another individual were asked to step out of the carport storage room and detained. This room is inaccessible from and to the residence on the PREMISES.

10.     Based on this Affiants experience and the facts stated in this affidavit I believe there is probable cause to search the residence and any vehicles on the PREMISES or those items listed on Attachment A which is incorporated by reference to search for marijuana, marijuana packaging, drug paraphernalia, indicia of residency, indicia of ownership of the two vehicles.

After review of all the circumstances set forth in the Revised Affidavit, *supra*, there is insufficient content therein to support a finding of probable cause to search the Residence for evidence of drug trafficking. *Franks*, 438 U.S. at 172. Moreover, there is no fair probability that evidence of drug trafficking would be found in the Residence. *Gates*, 462 U.S. at 238. The only reasonable conclusion that can be arrived at is that there was probable cause to search the carport storage room for evidence of paraphernalia for marijuana use and/or simple possession of marijuana. The Revised Affidavit lacks a reasonable nexus between the carport storage room and the evidence sought in the Residence. *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002).

The totality of factors set forth in the Revised Affidavit does not provide a substantial basis to conclude that Defendant was engaged in an ongoing scheme of drug distribution. *United States v. Rodriguez*, 869 F.2d 479, 484 (9th Cir. 1989).  The totality of factors set forth in the Revised Affidavit is based on Agent Van Holsbeke's two drive-bys of the Premises and the two times he parked near the Premises during a generously assumed ten hours (8:30 a.m. to 6:30 p.m.) on March 4, 2008 during which time he left the area to follow the blue Pontiac Grand Am to another location.  (Supp. Hrg. 1 at pp. 11, 17, 86-88); and two drive-bys of the Premises during three hours (8:00 a.m. to 11:00 a.m.) on March 5, 2008 during which time he left to debrief agents for an anticipated "knock and talk."  (Supp. Hrg. 1 at pp. 19-20, 23, 90).  At the time Agent Van Holsbeke prepared the Affidavit in this case he opines he did not have all the facts necessary to support it, but rather, the facts of what had been observed.  (*Franks* Hrg. at p.47).  Agent Van Holsbeke is the only one observing and surveilling the Premises and the facts in the Affidavit of what he observed are not supported by his sworn testimony before this Court.

The Court finds that the Revised Affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Leon*, 468 U.S. 897, 923 (1984). The Magistrate Judge recommends that Defendant's Motion To Quash Warrant And Suppress All Evidence Obtained Thereby As Tainted By An Illegal Search And Seizure (*Franks*) (Doc. No. 50) be granted and any and all evidence seized under Search Warrant Case No. 08-00092M at the  Residence on March 5, 2008 be suppressed.

## VIII. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court:

1. Deny Defendant's Motion To Dismiss Indictment For Due Process and Sixth Amendment Violation (Doc. No. 71);

2. Deny Defendant's Motion To Suppress Evidence and Statements As Tainted By An Illegal Search And Seizure (Doc. No. 22);

3. Grant Defendant's Motion To Suppress Statements For Due Process and *Miranda* Violation, supplemented by Defendant's Supplemental Memorandum In Support Of Motion To Suppress For *McNabb-Mallory* Violation (Doc. Nos. 21, 56); and

4. Grant Defendant's Motion To Quash Warrant And Suppress All Evidence Obtained Thereby As Tainted By An Illegal Search And Seizure (*Franks*) (Doc. No 50).

Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal Procedure, any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: **CR 08-0431-TUC-CKJ**.

Failure to file objections in accordance with Fed.R.Cr.P. 59 will result in waiver of the right to review.

DATED this 29th day of May, 2009.

_____
Héctor C. Estrada
United States Magistrate Judge